The appellant, Alonza James Allen, was convicted for the murder of Jeannie Griffin. He was sentenced to 12 years' imprisonment and was ordered to pay $11,724.25 in restitution. Two issues are raised in this appeal from that conviction.
 I
The appellant contends that the evidence was not sufficient to support his conviction for murder.
The State's evidence established that Jeannie Griffin died as a result of injuries received when the automobile in which she was a passenger collided with a vehicle driven by the appellant. The collision occurred on Highway 165 in Russell County around 5:20 on the afternoon of April 26, 1991. It is undisputed that the appellant's automobile crossed the center line of the two-lane highway and struck the vehicle occupied by Ms. Griffin and driven by her friend, Delilah Piniella.
Alabama State Trooper Ben Menefee testified on direct examination that "yaw marks" on the highway indicated that the *Page 1189 
appellant's car had entered Ms. Piniella's lane at an angle. He acknowledged on cross-examination that these marks also indicated that, prior to the collision, the appellant's car had gone off the highway onto the shoulder, which was some four to six inches below the highway surface, and that the appellant "came back on the pavement by jerking his wheels." R. 181. Both Robert Perry, who had been travelling behind the appellant for ten to twelve minutes and who witnessed the collision, and Ms. Piniella testified that they did not see the appellant's car go off of the highway onto the shoulder. Mr. Perry testified that, before the collision, the appellant swerved across the center line, went back in his own lane, then veered across the center line and struck Ms. Piniella's car. R. 84. Ms. Piniella stated that, when she first noticed it, the appellant's car was "weaving in the lane just a little bit, but still staying on its own side of the road," and then, suddenly, "the car was all over the place" and the collision occurred. R. 60-61.
Trooper Menefee acknowledged on cross-examination that the appellant and Clarence Hunter, a passenger in the appellant's car, told him at the scene of the collision that their vehicle was run off the road by "an 18-wheeler, a semi." R. 170. He also acknowledged that an individual who stopped at the scene of the collision stated that "he had been run off the road by a truck north of where the accident occurred." Id. However, Trooper Menefee stated that the appellant, Mr. Hunter, and the third individual all gave him different descriptions of the truck. Further, Mr. Perry testified that there was no tractor-trailer truck that ran the appellant off the road and Ms. Piniella stated that there had been no tractor-trailer truck travelling in front of her vehicle.
Trooper Menefee stated that when he arrived at the scene of the collision around 5:45 p.m., the appellant "had a strong odor of alcoholic beverage about his person. He was swaying as he was standing. And he also had glassy, bloodshot eyes." R. 117-18. According to Trooper Menefee, the appellant unsatisfactorily performed several field sobriety tests. Based on his observations and the appellant's performance of the field sobriety tests, Trooper Menefee formed the opinion that the appellant "was under the influence of alcohol," and he arrested the appellant for driving under the influence. R. 126. An Intoxilyzer 5000 breath test revealed that the appellant's blood alcohol content was .163%.
The appellant testified in his own behalf and admitted that he had consumed three beers between the time he left his place of employment at 2:45 p.m. and the time of the collision. However, he stated that he was not "drunk" and that his ability to operate his vehicle was not impaired. The appellant presented evidence that his knee had been fractured in the collision and he contended that he failed the field sobriety tests due to this injury and the resulting pain. However, the appellant's testimony conflicted with Trooper Menefee's as to whether the appellant had informed Menefee of any injury at the scene of the collision.
The appellant also testified that, immediately before the collision with Ms. Piniella's car, an oncoming tractor-trailer truck had veered into his lane, and that he had been forced to move to the right in order to avoid a collision with the truck. According to the appellant, in his attempt to avoid the oncoming truck both of the tires on the right side of his vehicle went onto the shoulder, which was lower than the surface of the highway. The appellant testified that when he attempted to return to the highway after the truck had passed by, "the right front tire . . . got caught on the side, on the drop-off on the road" and that he "snatched [the steering wheel] back" and "it kind of throwed the car at a 45 degree angle." R. 297. The appellant's car then traveled into the oncoming lane and struck the vehicle occupied by Ms. Griffin and Ms. Piniella. Clarence Hunter, a friend of the appellant's who was riding with the appellant at the time of the collision, also testified to this version of the events.
The appellant was charged with the form of murder generally referred to as either "reckless," "universal malice" or "depraved *Page 1190 
heart" murder. This form of murder is defined in Ala. Code 1975, § 13A-6-2(a)(2): "A person commits the crime of murder if . . . [u]nder circumstances manifesting extreme indifference to human life, he recklessly engages in conduct which creates a grave risk of death to a person other than himself, and thereby causes the death of another person." One of the elements the prosecution must prove under the clear language of §13A-6-2(a)(2) is "conduct which manifests an extreme indifference to human life." King v. State, 505 So.2d 403, 407
(Ala.Cr.App. 1987). The appellant asserts that the prosecution failed to prove "that he acted with 'extreme indifference to human life.' " Appellant's brief at 21. We disagree.
This Court has, on several occasions, addressed the question of the sufficiency of the evidence in the context of a prosecution for reckless murder involving a defendant who was driving while intoxicated. See, e.g., Davis v. State,593 So.2d 145, 148 (Ala.Cr.App. 1991); Patterson v. State, 518 So.2d 809,815-16 (Ala.Cr.App. 1987); Smith v. State, 460 So.2d 343, 346
(Ala.Cr.App. 1984); Slaughter v. State, 424 So.2d 1365, 1367
(Ala.Cr.App. 1982); Jolly v. State, 395 So.2d 1135, 1137-41
(Ala.Cr.App. 1981). It does not appear that we have previously specifically addressed the element of "manifesting extreme indifference to human life" in that regard, although we made a brief reference to the matter in Jordan v. State,486 So.2d 482, 484 (Ala.Cr.App. 1985), affirmed on other grounds,486 So.2d 485 (Ala. 1986). We note that § 13A-6-2(a)(2) "reflects the judgment that there is a kind of reckless homicide that cannot fairly be distinguished in grading terms from homicides committed purposely or knowingly." Model Penal Code, Commentaries § 210.2 at 21. Stated another way, the conduct condemned by § 13A-6-2(a)(2) is that which is culpably equivalent to intentional murder. Consequently, while "[w]hat amounts to 'extreme indifference' depends on the circumstances of each case, . . . some shocking, outrageous, or specialheinousness must be shown." King v. State, 505 So.2d 403, 407
(Ala.Cr.App. 1987) (emphasis added). For example, §13A-6-2(a)(2) "embrace[s] those homicides caused by . . . driving an automobile in a grossly wanton manner." Northingtonv. State, 413 So.2d 1169, 1172 (Ala.Cr.App. 1981), cert. quashed, 413 So.2d 1172 (Ala. 1982) (emphasis added).
Section 13A-6-2(a)(2) also requires the State to prove that the defendant engaged in reckless conduct.
 "Recklessness, as defined in [§ 13A-2-2(3)] presupposes an awareness of the creation of substantial homicidal risk, a risk too great to be deemed justifiable by any valid purpose that the actor's conduct serves. Since risk, however, is a matter of degree and the motives for risk creation may be infinite in variation, some formula is needed to identify the case where recklessness may be found and where it should be assimilated to purpose or knowledge for purposes of grading. Under [our statutory scheme], this judgment must be made in terms of whether the actor's conscious disregard of the risk, given the circumstances of the case, so far departs from acceptable behaviour that it constitutes a 'gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.' Ordinary recklessness in this sense is made sufficient for a conviction of manslaughter under [§ 13A-6-3(a)(1)]. In a prosecution for murder, however, [§ 13A-6-2(a)(2)] calls for the further judgment whether the actor's conscious disregard of the risk, under the circumstances, manifests extreme indifference to the value of human life. The significance of purpose or knowledge as a standard of culpability is that, cases of provocation or other mitigation apart, purposeful or knowing homicide demonstrates precisely such indifference to the value of human life. Whether recklessness is so extreme that it demonstrates similar indifference is not a question, it is submitted, that can be further clarified. It must be left directly to the trier of fact under instructions which make it clear that recklessness that can fairly be assimilated *Page 1191 to purpose or knowledge should be treated as murder and that less extreme recklessness should be punished as manslaughter."
Model Penal Code, Commentaries § 210.2 at 21-22 (emphasis added and footnotes omitted).
Where we have previously found the evidence to be sufficient to support a conviction for reckless murder, the defendant was clearly operating his vehicle in a "grossly wanton manner" or under circumstances exhibiting "some shocking, outrageous, or special heinousness." See Davis v. State, 593 So.2d at 148
(defendant, who had a blood alcohol content of .237% and several convictions for driving under the influence, "drove through dense fog at speeds of between 75 and 88 miles per hour" and "hit the victims' vehicle head-on in their lane of traffic"); Patterson v. State, 518 So.2d at 810-11, 816 (defendant, who had a blood alcohol content of .3%, a previous arrest for driving under the influence, and had previously undergone alcoholic treatment, was driving at a speed of between 50 and 70 miles per hour when his vehicle crossed the median, without appearing to brake, and struck the victim's car); Smith v. State, 460 So.2d at 345 (defendant, who had a blood alcohol content of .25%, "collided head-on" with the victims' vehicle); Slaughter v. State, 424 So.2d at 1366-67
(defendant, who had a blood alcohol content of between .16% and . 19% and at least four prior arrests for driving under the influence, was speeding, " 'fishtailing and ricocheting back and forth from one side to the other,' " and "traveling 'like [his car] was out of control,' " prior to crossing the oncoming lane of traffic, "jump[ing] the curb and str[iking] the victim as she was working in her front yard"); Jolly v. State,395 So.2d at 1137-38 (defendant was driving fast and " 'wobbling' " on the road, then drove "off the road and traveled through the front of several yards" before colliding with the vehicle in which the victim was a passenger). See also Pears v. State,672 P.2d 903, 909 (Alaska App. 1983) (evidence sufficient to support conviction for reckless murder where defendant voluntarily drank to point of intoxication, then "drove recklessly, speeding, running through stop signs and stop lights and failing to slow for yield signs," and continued to drive in this manner after his passenger told him that he was scaring her and after being stopped by two uniformed police officers who instructed him "not to drive because he was too intoxicated"), remanded on other grounds, 698 P.2d 1198 (Alaska 1985); Walden v. Commonwealth, 805 S.W.2d 102, 103, 105
(Ky. 1991) (evidence that defendant, who had a blood alcohol content of .297%, was driving at a high rate of speed on a two-lane country road, "dropped a wheel off the pavement, lost control, crossed the center line," and struck another vehicle was sufficient to support his conviction for reckless murder). Cf. People v. Moquin, 142 A.D.2d 347, 536 N.Y.S.2d 561, 565-66
(1988) (evidence that defendant drove her vehicle "while highly intoxicated and at an excessive rate of speed in the lane for oncoming traffic," and that she failed to avoid an oncoming vehicle "despite the opportunity to do so constitute[d] legally sufficient evidence" to preclude the dismissal of a charge of reckless murder); Essex v. Commonwealth, 228 Va. 273,322 S.E.2d 216, 218, 222 (1984) (under Virginia statutory scheme, evidence that, for a distance of six miles, the defendant was engaging in dangerous passing maneuvers, running off the side of the road, veering into the oncoming lane, swerving from one lane to the other, running red lights, and speeding was "insufficient to support a finding of implied malice" required for a conviction of second degree murder, but "clearly met the . . . standard for proof of involuntary manslaughter: an 'accidental killing which, although unintended, is the proximate result of negligence so gross, wanton, and culpable as to show a reckless disregard of human life' "). We note that the underlying facts were similar in nature in cases where sufficiency of the evidence was not at issue on appeal. See, e.g., Robinson v. State, 584 So.2d 533, 535-36 (Ala.Cr.App.) (defendant, who had a blood alcohol content of . 193%, was speeding, crowding the right-hand lane of the interstate, and driving "in the middle of the road," before he "suddenly veered left, careened *Page 1192 
into a ditch in the median, and 'somersaulted' into the oncoming . . . traffic," where he collided with the victims' vehicle), cert. quashed, 584 So.2d 542 (Ala. 1991).
In Jordan v. State, 486 So.2d 482 (Ala.Cr.App. 1985), affirmed, 486 So.2d 485 (Ala. 1986), the defendant was convicted of reckless murder under § 13A-6-2(a)(2). The evidence showed that the defendant arrived at a friend's house in an intoxicated condition, consumed two beers, then drove with his friend to a package store some two miles distant. The defendant drove to the store "in a reckless manner, occasionally swerving completely into the oncoming lane of traffic on the two-lane road," "running off the road," and "forc[ing] two oncoming cars from the road by driving in the oncoming traffic lane." Jordanv. State, 486 So.2d at 483. The defendant purchased a bottle of tequila at the package store. He drank from this bottle during the drive back to his friend's house and continued to drive in a reckless fashion. At one point when the defendant was driving "in the wrong lane," his friend "took the steering wheel and eased the [vehicle] back into the proper lane. While looking angrily at [his friend, the defendant] jerked the steering wheel back, causing the [vehicle] to reenter the other lane of traffic" where it collided with a vehicle driven by John Odom, killing Odom. Ex parte Jordan, 486 So.2d 485, 486 (Ala. 1986).
The State presented evidence that the defendant's blood alcohol content was .14%. Jordan v. State, 486 So.2d at 483. In addressing the defendant's contention that this evidence should not have been admitted, we observed:
 " 'It is well settled under our decisions that where the accused is himself the driver of an automobile and drives it in a manner greatly dangerous to the lives of others so as to evidence a depraved mind regardless of human life, he may be guilty of [reckless murder] if his anti-social acts result in the death of another, and this though he had no preconceived purpose to deprive any particular human being of life. . . .'
 "In the present case had the [defendant] been completely sober, his actions before the collision would have evidenced a depraved mind functioning without regard for human life. The fact that a defendant had been drinking before an accident is just one further circumstance to prove that he possessed an extreme indifference to human life."
Jordan v. State, 486 So.2d at 484 (quoting Berness v. State,38 Ala. App. 1, 83 So.2d 607 (1953), affirmed, 263 Ala. 641,83 So.2d 613 (1955).
"Depending on the situation, drunk driving may be . . . a circumstance" that a jury could find to "manifest[ ] extreme indifference to human life." Walden v. Commonwealth,805 S.W.2d 102, 105 (Ky. 1991). Jordan and the other cases cited above demonstrate that the "situation" that will support a conviction for reckless murder must involve something more than simply driving after having consumed alcohol and becoming involved in a collision. As noted above, § 13A-6-2(a)(2) contemplates conduct that is the culpable equivalent of intentional murder.
"In determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution." Faircloth v. State,471 So.2d 485, 489 (Ala.Cr.App. 1984), affirmed, 471 So.2d 493
(Ala. 1985). In the present case, the jury could have found, from the testimony of the State's witnesses, that the appellant was driving his vehicle in a reckless manner by weaving in his own lane; by swerving into the oncoming lane; by running off the surface of the road onto a low shoulder and attempting to return in an unsafe manner; or by engaging in a combination of any of the three. The prosecution also presented evidence from which the jury could have found that the appellant was legally intoxicated while driving his car in a reckless manner. Although it is a close question, we find that there was sufficient evidence from which the jury could have concluded that the appellant's *Page 1193 
overall conduct was so grossly wanton that it manifested an extreme indifference to human life. We note that the trial court instructed the jury on the lesser included offenses of manslaughter, vehicular homicide, and criminally negligent homicide. It was within the province of the jury, not this Court, to determine the culpability level of the appellant.
We note that the evidence in the instant case parallels, to some extent, the evidence in Walden v. Commonwealth. In Walden, the defendant "dropped a wheel off the pavement, lost control, crossed the center line," and struck the victim's vehicle.805 S.W.2d at 103. The defendant in Walden was also speeding. Further, he had a blood alcohol level of .297%, which an expert witness testified "was not far short of the 0.3% reading at which the average person would normally pass out." The expert also testified that this level of intoxication would delay reaction time and cause disorientation, confusion, a problem with depth perception and balance, and affect one's judgment."Id. The Kentucky Supreme Court held that "the extreme nature of the [defendant's] intoxication was sufficient evidence from which a jury could infer wantonness so extreme as to manifest extreme indifference to human life." Id. at 105. Although there was no evidence in this case that the appellant was speeding and the appellant's blood alcohol content was somewhat lower than Walden's, we are unwilling to say that those differences, as a matter of law, render the evidence in this case insufficient to support the appellant's conviction.
We are aware of two Alabama cases in which the defendants' convictions for reckless murder were overturned on the grounds of insufficiency of the evidence. However, we do not find either of those cases to be persuasive here. In Langford v.State, 354 So.2d 313, 314 (Ala. 1977), the defendant's conviction for reckless murder was reversed even though he had a blood alcohol level of .25%, he had been "traveling in excess of 90 miles per hour immediately proceeding the collision," "struck a mileage marker on the right side of a four-lane highway," "swerved to the left and crossed the median," then collided with the victim's vehicle, "which was traveling in the opposite direction." Langford, however, involved a prosecution under Tit. 14, § 314, Ala. Code (Recomp. 1958),[1] and a majority of the Alabama Supreme Court was apparently concerned that there had not, prior to Langford's conviction, been a conviction for first degree murder arising out of a driving under the influence situation. Two dissenting justices were strongly of the opinion that the evidence was clearly sufficient to create a jury question. 354 So.2d at 316-17 (Maddox, J., dissenting, joined by Beatty, J.). We also note that Langford was decided in 1977, long before the extensive public awareness programs targeting the dangers of driving while intoxicated.
In Watson v. State, 504 So.2d 339 (Ala.Cr.App. 1986), this Court reversed the defendant's conviction for reckless murder under § 13A-6-2(a)(2), even though the defendant was driving while under the influence of prescribed medication, was speeding, and was passing a bus in a no-passing zone when she struck and killed a child pedestrian. Watson appears to have relied predominantly on Langford and has been previously criticized by this Court. See Weaver v. State, 591 So.2d 535,543-45 (Ala.Cr.App. 1991).
The death of Jeannie Griffin was tragic and senseless. For years, the risks and dangers of driving while intoxicated have been well publicized and it is virtually impossible for any reasonably intelligent person to be unaware of those risks and dangers. Those who persist in engaging in that type of conduct must accept the risk of being prosecuted for any number of offenses, including reckless murder.
 II
The appellant argues that the trial court erred in permitting Ms. Griffin's husband to testify at trial. *Page 1194 
On direct examination, Ms. Piniella testified, without any objection by the appellant, that, at the time of the collision, she was living with Ms. Griffin and Ms. Griffin's 18-month-old daughter, Amanda. She stated that Ms. Griffin "was pregnant, she was getting ready to have her baby, so we were looking for a larger trailer." R. 58. Ms. Piniella also testified, without objection, that Ms. Griffin's husband, Carl, was in the service and was in Saudi Arabia at that time. R. 59.
At the end of its case-in-chief, the prosecution stated that it "would like to call PFC Carl Griffin, who is the widower of the deceased in this case, to testify purely for purposes of identifying the victim and offering into evidence . . . a photograph [of the victim]." R. 217. The appellant objected to the admission of the photograph on the ground that "[i]dentity is not an issue." R. 218 He objected to the testimony of Mr. Griffin on the grounds that "he has no personal knowledge of anything other than the fact that she died, which is well documented" and that the testimony was "only be[ing] offered to inflame the passions of the jury." R. 218.
The trial court overruled the appellant's objection and permitted Mr. Griffin to testify. His testimony was very brief, covering less than a page and a half in the transcript. R. 221-22. Aside from identifying a photograph of Ms. Griffin, his testimony was essentially that, prior to her death, he had been married to Jeannie Griffin, and that, at the time of her death, he was stationed in Saudi Arabia as "part of the allied forces." R. 221.
On appeal, the appellant does not contest the admission of the photograph of Ms. Griffin. However, he argues that the testimony of Mr. Griffin was irrelevant, immaterial, highly inflammatory, and prejudicial. We need not determine whether this testimony was inadmissible on any of these stated grounds. Even if it were, "the erroneous admission of evidence is not grounds for reversal if the same evidence has previously been admitted without objection." Springfield v. State,580 So.2d 88, 90 (Ala.Cr.App.), cert. stricken, 596 So.2d 659 (Ala. 1991).
For the reasons stated above, the judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.
[1] Title 14, § 314, defined first degree murder to consist of certain homicides, including those "perpetuated by any act greatly dangerous to the lives of others, and evidencing a depraved mind regardless of human life."