Michael V. JEFFRIES, Appellant,

v.

STATE of Alaska, Appellee.

No. A–8167.

Court of Appeals of Alaska.

May 14, 2004.

---

10. *State v. Laraby*, 842 P.2d 1275, 1279 (Alaska App.1992).

11. 639 P.2d 277 (Alaska 1982).

12. *Id.* at 295.

Quinlan Steiner, Assistant Public Defender, and Barbara K. Brink, Public Defender, Anchorage, for the Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

This appeal requires us to examine the distinction between two degrees of criminal homicide: manslaughter as defined in AS 11.41.120(a)(1), which requires proof of the defendant's recklessness; and second-degree murder as defined in AS 11.41.110(a)(2), which requires proof of a recklessness so heightened as to constitute "an extreme indifference to the value of human life".

In prior cases, we have upheld second-degree murder convictions for intoxicated drivers who killed other people. But in each of those instances, the defendant drove in ways that were manifestly extremely dangerous (even leaving aside the fact that the defendant's perceptions and reactions were impaired due to intoxication). In the present case, the defendant's physical acts of driving included only one reported lapse: he made a left turn directly in front of an oncoming car.

To prove Jeffries's "extreme indifference to the value of human life", the State relied heavily on evidence that Jeffries had numerous prior convictions for driving while intoxicated, that his license had been revoked for the previous ten years, that he had been drinking all day in violation of the conditions of his probation, and that he had previously refused several times to participate in court-ordered alcohol treatment programs. On appeal, Jeffries argues that this is an improper way to prove "extreme indifference". He asserts that extreme indifference must be proved solely by the quality of the defendant's conduct during the episode in question.

Jeffries contends that his particular act of careless driving—the dangerous left turn—was not particularly egregious compared to the acts of careless driving that would typically lead to manslaughter convictions. Because Jeffries's physical conduct involved only a single dangerous left turn, he argues that he should have been convicted only of manslaughter.

For the reasons explained here, we conclude that Jeffries's suggested construction of the second-degree murder statute is too narrow. We have examined court decisions from jurisdictions that (like Alaska) have second-degree murder statutes derived from the Model Penal Code. We have also examined court decisions from jurisdictions that retain a common-law definition of murder—a definition that requires proof of "malice". Both of these groups of jurisdictions have upheld second-degree murder convictions in cases where the government's proof of extreme recklessness rested primarily on an intoxicated driver's persistent recidivism and failures at rehabilitation.

We, too, now hold that "extreme indifference to the value of human life" can be proved in this fashion. When a jury deliberates whether an intoxicated driver is guilty of second-degree murder or only manslaughter, the jury can lawfully consider the defendant's past convictions for driving while intoxicated, the defendant's refusals to honor license suspensions or abide by the conditions of probation in those prior DWI cases, and the defendant's past refusals to engage in alcohol treatment programs. We therefore affirm Jeffries's conviction for second-degree murder.

### Underlying facts

On February 8, 2000, Michael V. Jeffries spent most of the day drinking. Viewing the evidence presented at trial in the light most favorable to the State, Jeffries downed approximately twenty beers over the course of several hours. In the mid-afternoon, Jeffries and his long-time girlfriend, Beulah Dean, arrived at the Veterans of Foreign Wars club in Mountain View. They stayed there until approximately 8:00 p.m., with Jeffries continuing to drink beer. Jeffries and Dean then left the VFW to go home; Jeffries was driving.

Some fifteen minutes later, at the corner of DeBarr Road and Columbine Street, Jeffries made a left turn directly in front of an oncoming car. The other driver, who was traveling on DeBarr Road at a lawful speed of approximately 45 miles per hour, "had [just] enough warning to take [his] foot off the gas" before he collided with the passenger side of Jeffries's vehicle. When the paramedics arrived a few minutes later, Beulah Dean was bleeding from her head and was completely unresponsive. She was taken to the hospital, where she died a short time later.

When the police contacted Jeffries at the scene, he staggered when he walked, he leaned on his car for balance, and he smelled of alcoholic beverages. Jeffries's blood alcohol level tested at .27 percent.

Jeffries had six prior convictions for driving while intoxicated, and his driver's license had been revoked for the ten years preceding this incident. (Jeffries was not eligible to obtain a driver's license until 2018.) Jeffries was on probation, and one of his conditions of probation was to refrain from drinking alcoholic beverages. Four times previously, Jeffries had refused to participate in court-ordered alcohol treatment programs.

Jeffries was initially charged with manslaughter for causing Dean's death, but the State later re-indicted Jeffries for second-degree murder. Following a jury trial, Jeffries was convicted of this charge (as well as driving while intoxicated and driving while his license was suspended or revoked).

### The distinction between "recklessness" and "extreme indifference to the value of human life"

Under AS 11.41.120(a)(1), the crime of manslaughter consists of causing the death of another human being while acting at least recklessly with respect to this result. The term "recklessly" is defined in AS 11.81.900(a)(3):

[A] person acts "recklessly" with respect to a result ... when the person is aware of and consciously disregards a substantial and unjustifiable risk that the re-

sult will occur ...; the risk must be of such a nature and degree that disregard of it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation; a person who is unaware of a risk of which the person would have been aware had that person not been intoxicated acts recklessly with respect to that risk[.]

In contrast, the crime of second-degree murder defined in AS 11.41.110(a)(2) requires proof that the defendant "knowingly engage[d] in conduct that result[ed] in the death of another person under circumstances manifesting an extreme indifference to the value of human life".

Alaska's criminal code does not contain an express definition of "extreme indifference to the value of human life". However, this Court defined this phrase in *Neitzel v. State,* 655 P.2d 325 (Alaska App.1982). We concluded that "extreme indifference to the value of human life" was intended to codify the common-law concept of "reckless murder".[1]

As we explained in *Neitzel,* murder was defined at common law as a homicide committed with "malice".[2] Generally speaking, "malice" referred to any intentional homicide that was not justified, excused, or mitigated.[3] However,

[the][c]ommon-law courts permitted a jury to find malice [even] in the absence of a specific intent to kill [when the defendant's] act was done with such heedless disregard of a harmful result, foreseen as a likely possibility, that it differ[ed] little in the scale of moral blameworthiness from an actual intent to [kill].... Typical examples of this kind of murder are: shooting ... into a home, room, train, or automobile in which others are known to be or might be.

*Neitzel,* 655 P.2d at 327.[4]

The Model Penal Code contains a provision— § 210.2(1)(b)—that declares a homicide to be murder if "it is committed recklessly under circumstances manifesting extreme indifference to the value of human life".[5] The drafters of the Model Penal Code intended this provision to apply to "[the] kind of reckless homicide that cannot fairly be distinguished [in terms of blameworthiness] from homicides committed purposely or knowingly".[6] As explained in the Commentary to this provision of the Model Penal Code,

[R]isk [is always] a matter of degree[,] and the motives for risk creation may be infinite in variation[.] ... [If] the actor's conscious disregard of the risk, given the circumstances of the case, so far departs from acceptable behavior that it constitutes a "gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation ...", [this culpable mental state is] sufficient for a conviction of manslaughter.... In a prosecution for murder, however, the [Model Penal] Code calls for the further judgment [of] whether the actor's conscious disregard of the risk, under the circumstances, manifests extreme indifference to the value of human life.... Whether [the actor's] recklessness is so extreme that it demonstrates [extreme] indifference [to the value of human life] is not a question ... that can be further clarified. It must be left directly to the trier of fact under instructions which make it clear that [a] recklessness that can fairly be [likened] to purpose or knowledge should be treated as murder and that less extreme recklessness should be punished as manslaughter.

American Law Institute, *Model Penal Code and Commentaries* (1980), Part II, § 210.2, pp. 21–22.[7]

This provision of the Model Penal is the source of our "extreme indifference" provi-

---

**1.** *Neitzel,* 655 P.2d at 327.

**2.** *Id.*

**3.** *Id.*

**4.** Quoting Rollin M. Perkins, *Criminal Law* (2nd edition 1969), § 1, pp. 36 & 768.

**5.** Quoted in *Neitzel,* 655 P.2d at 332.

**6.** American Law Institute, *Model Penal Code and Commentaries* (1980), Part II, § 210.2, p. 21, quoted in *Neitzel,* 655 P.2d at 335.

**7.** Quoted in *Neitzel,* 655 P.2d at 335–36.

sion, AS 11.41.110(a)(2).[8] After reviewing the statutory history of this language, we concluded in *Neitzel* that the Alaska Legislature intended AS 11.41.110(a)(2) to apply to cases where the defendant "knowingly engage[s] in conduct ... which[,] in light of the circumstances[,] is reckless to the point that it manifests an extreme indifference to the value of human life".[9]

The word "reckless" in that last sentence is used in its technical sense—*i.e.*, the sense defined in AS 11.81.900(a)(3). When *Neitzel* was litigated, the State argued that the phrase "extreme indifference to the value of human life" referred to "an objective standard" of dangerousness, and that this concept was therefore "similar to negligence rather than ... recklessness" in the sense that the State did not have to prove the defendant's subjective awareness of the risk.[10] This Court rejected the State's interpretation of the statute; we held that "extreme indifference to the value of human life" is an extreme form of recklessness, not an extreme form of negligence.[11]

■ *Neitzel* lists four factors that a jury should weigh when deciding whether a defendant's conduct manifested "recklessness" or "extreme indifference to the value of human life": the "social utility of the actor's conduct", the "magnitude of the risk [that the defendant's] conduct create[d], including both the nature of the foreseeable harm and the likelihood that the conduct [would] result in that harm"; "the [extent of the] actor's knowledge of the risk"; and "any precautions [that] the actor [took] to minimize the risk." [12]

*Neitzel* actually lists the third factor as "the actor's knowledge of the risk". But this passage from *Neitzel* is addressed to the broader issue of how a jury should differentiate *three* levels of culpability: criminal negligence, recklessness, and extreme indifference

to the value of human life.[13] As the *Neitzel* opinion points out, the actor's knowledge of the risk is the factor that generally distinguishes "criminal negligence" from "recklessness".[14]

■ When the jury is debating "recklessness" versus "extreme indifference to the value of human life", both of these levels of culpability presuppose that the defendant was aware of the risk (or that the defendant would have been aware of the risk but for intoxication). Therefore, in distinguishing between recklessness and extreme indifference to the value of human life, the pertinent question is not whether the actor was "aware of the risk [of death]"—for, leaving aside instances of intoxication, the actor must have been subjectively aware of this risk to support a finding of either recklessness or extreme indifference. Rather, the pertinent question is whether the defendant's level of awareness of the risk exceeded the level of awareness necessary to establish the defendant's recklessness as defined in AS 11.81.900(a)(3).

*Jeffries's argument that the State's evidence is insufficient, as a matter of law, to support a conviction for second-degree murder*

■ Jeffries contends that a drunk-driving homicide should typically lead to a manslaughter conviction, and that a conviction for second-degree murder is justified only in extreme cases. We agree with this contention.

In *St. John v. State*, this Court held that "evidence that a defendant drove while intoxicated and, as a result, caused the death of another person" is sufficient to establish "a prima facie case of the recklessness necessary for a finding that the defendant committed manslaughter".[15] And in *Neitzel*, we suggested that an intoxicated driver should

---

**8.** *Id.* at 335.

**9.** *Id.* at 332–33.

**10.** *Id.* at 332. *Compare* AS 11.81.900(a)(3) (the definition of "recklessly") *with* AS 11.81.900(a)(4) (the definition of "criminal negligence").

**11.** *Neitzel*, 655 P.2d at 334.

**12.** *Id.* at 336–37.

**13.** *Id.* at 336.

**14.** *Id.* at 337.

**15.** 715 P.2d 1205, 1209 (Alaska App.1986).

not be convicted of "extreme indifference" murder unless the driver's actions "create[d] a much greater risk [of] death" than the risk that is created by simply driving home from a bar in an intoxicated condition.[16]

Thus, our case law supports Jeffries's contention that a typical drunk driving homicide should be prosecuted as manslaughter. But Jeffries's appeal requires us to examine and clarify what is meant by a "typical" drunk driving homicide.

Jeffries argues that defendants who commit drunk driving homicides can not properly be convicted of "extreme indifference" second-degree murder unless their handling of the motor vehicle on the occasion in question manifested an extreme degree of overt dangerousness or heedlessness—a degree of overt dangerousness or heedlessness far exceeding the type of careless driving that one might expect from an intoxicated person who was apparently trying to drive safely. Jeffries asserts that "extreme indifference to human life" can not be established in the way that the State sought to prove this element at his trial—to wit, by showing that Jeffries had a history of past convictions for driving while intoxicated, that Jeffries had repeatedly refused to engage in rehabilitative treatment, and that Jeffries had for years continued to drive and to drink even though he knew that he was prohibited by law from doing either (because his license was revoked and his conditions of probation prohibited him from drinking).

In several of our past cases dealing with vehicular homicide charged as second-degree murder, the defendant's conduct has fit the definition suggested by Jeffries. That is, the defendants engaged in egregiously dangerous driving—much more dangerous than simply taking control of a vehicle while intoxicated and then driving carelessly.

For instance, in *Foxglove v. State*, 929 P.2d 669 (Alaska App.1997), the defendant intentionally drove his snow machine at a speed of 70 miles per hour through a crowd of people gathered around a bonfire.[17] In *Ratliff v. State*, 798 P.2d 1288(Alaska App.1990), the defendant weaved across the road, forcing one oncoming car completely off the road and into a snowbank, and forcing another car to veer almost off the road in order to avoid a head-on collision. Ratliff then entered the wrong side of a divided highway, passing two pairs of large signs that warned him he was going the wrong way. Driving in excess of the speed limit, and disregarding the efforts of motorists who flashed their lights to get his attention, Ratliff drove for two miles before colliding head-on with another car.[18] In *Stiegele v. State*, 714 P.2d 356 (Alaska App. 1986), the defendant spun his truck around 360 degrees, then headed up a road on the left side. Shortly afterwards, the police observed the defendant's truck traveling down the wrong side of the road at approximately 85 miles per hour, then leave the road and crash into the woods. Witnesses testified that, before the crash, the passengers in the truck were screaming for Stiegele to stop.[19] And in *Pears v. State*, 672 P.2d 903 (Alaska App.1983), the defendant repeatedly exceeded the speed limit and ran through stop signs and red lights, disregarding the warnings of his passenger. He then dropped off his passenger and continued driving. Just before the fatal collision, Pears saw that the cars in front of him were stopping for a red light, so he drove around those cars in the right-turn lane, then entered the intersection without slowing down. Pears collided with one of the cars entering the intersection on the green light; he knocked this other car 146 feet.[20]

On the other hand, some of our prior cases involving intoxicated drivers convicted of second-degree murder have arisen from episodes in which the physical actions of the intoxicated drivers were fairly typical of what one might expect from an intoxicated person. In both *Richardson v. State*, 47 P.3d 660, 661 (Alaska App.2002), and *Puzewicz v. State*, 856 P.2d 1178, 1179 (Alaska App.1993), the defendants crossed the center line and collided with an oncoming car.

**16.** *Neitzel,* 655 P.2d at 337.

**17.** *Foxglove,* 929 P.2d at 670.

**18.** *Ratliff,* 798 P.2d at 1289–90.

**19.** *Stiegele,* 714 P.2d at 358–59.

**20.** *Pears,* 672 P.2d at 909.

In particular, the facts of *Puzewicz* are similar in most respects to the facts of Jeffries's case. Puzewicz spent most of the day drinking beer, and then he went driving in the evening and killed two people.[21] Although Puzewicz claimed to have drunk only four or five beers in the hours preceding the collision, his blood alcohol level was .219 percent.[22]

Puzewicz had three prior convictions for driving while intoxicated, and he was on probation from his third DWI conviction when he committed the murders.[23] Puzewicz was not supposed to be driving at all—because, as a result of his third DWI conviction, Puzewicz's driver's license had been revoked for ten years.[24] Moreover, Puzewicz had failed to undertake the residential treatment program that was required as part of his sentence for that prior conviction, and the district court had issued an unserved warrant for his arrest.[25]

However, the *Puzewicz* decision has little precedential value on the issue raised by Jeffries in this case. Puzewicz only pursued a sentence appeal, so this Court did not reach the question of whether the above-described evidence was legally sufficient to support Puzewicz's murder convictions.

Nevertheless, decisions from other states that have murder statutes based on the Model Penal Code suggest that the facts of *Puzewicz* are sufficient to support a conviction for "extreme indifference" murder.

Kentucky has an "extreme indifference" murder statute similar to Alaska's.[26] In *Estep v. Commonwealth*, 957 S.W.2d 191 (Ky. 1997), the Supreme Court of Kentucky held that an intoxicated motorist who crossed the center line and collided with an oncoming vehicle could be convicted of murder under this statute based primarily on evidence of her extreme intoxication:

> [Kentucky Statute] 507.020(1)(b) permits a conviction for wanton murder for the operation of a motor vehicle under circumstances manifesting extreme indifference to human life. . . . [C]onduct such as Estep's has been held to constitute wanton murder under such a statutory standard. *Walden v. Commonwealth*, Ky., 805 S.W.2d 102 (1991), held that a wanton murder conviction was proper because the conduct of the defendant amounted to more than a typical automobile accident by virtue of the extreme rate of speed and level of intoxication. . . . [T]his Court concluded that . . . the extreme nature of the intoxication was sufficient evidence from which a jury could infer wantonness so extreme as to manifest extreme indifference to human life. *Id.*

The evidence in this case demonstrated that Estep was driving her truck at a high rate of speed in an improper manner under the influence of drugs. Blood tests revealed the existence of five different types of drugs in Estep's body: Xanax, Elavil, Soma, Valium and Hydrocodone.

. . .

Eyewitnesses testified that Estep was seen passing at a rate of speed greater than 50 miles per hour in a no-passing zone near a curve in the road. The testimony indicated that after she completed passing one automobile, she failed to return to the proper lane and collided with a car on the wrong side of the road. One of the passengers in the other vehicle testified that . . . Estep was slumped over in her seat and that she raised her head only seconds before the fatal crash. There was evidence that[,] when Estep was taken to the hospital for observation following the accident[,] she kept passing out and appeared "pretty zonked." [This] was sufficient evidence that Estep was operating a motor vehicle under circumstances manifesting extreme indifference to human life and she wantonly engaged in conduct

21. *Puzewicz,* 856 P.2d at 1179.

22. *Id.*

23. *Id.* at 1180.

24. *Id.*

25. *Id.*

26. *See* Kentucky Stats. § 507.020(1)(b) (Baldwin 2003).

which created a grave risk of death and caused the death of another person.

*Estep,* 957 S.W.2d at 192–93.

The Alabama Court of Criminal Appeals reached a similar conclusion in *Allen v. State,* 611 So.2d 1188 (Ala.Crim.App.1992). Quoting the Kentucky court's decision in *Walden* with approval, the Alabama court agreed that "[d]epending on the situation, drunk driving may be . . . a circumstance that a jury could find to 'manifest[ ] extreme indifference to human life.' ".[27] The Alabama court then upheld a murder conviction for an intoxicated driver whose careless driving was manifested primarily by an inability to keep his vehicle within the proper lane of travel:

> [T]he "situation" that will support a conviction for reckless murder must involve something more than simply driving after having consumed alcohol and becoming involved in a collision. As noted above, [Alabama's reckless murder statute] contemplates conduct that is the culpable equivalent of intentional murder.
>
>   . . .
>
> In the present case, . . . the testimony of the State's witnesses [showed] that the appellant was driving his vehicle in a reckless manner by weaving in his own lane; by swerving into the oncoming lane; by running off the surface of the road onto a low shoulder and attempting to return in an unsafe manner; or by engaging in a combination of any of the three. The prosecution also presented evidence . . . that the appellant was legally intoxicated while driving his car in a reckless manner. Although it is a close question, we find that there was sufficient evidence from which the jury could have concluded that the appellant's overall conduct was so grossly

wanton that it manifested an extreme indifference to human life.

*Allen,* 611 So.2d at 1192–93.

The decision in *Allen* conforms to two earlier Alabama decisions, *Patterson v. State,* 518 So.2d 809 (Ala.Crim.App.1987),[28] and *Slaughter v. State,* 424 So.2d 1365 (Ala.Crim. App.1982).

The defendant in *Patterson* had previously undergone alcohol abuse treatment, and he had been arrested for driving while intoxicated within the previous year.[29] During the twelve hours preceding the homicide, Patterson drank three bottles of wine; his blood alcohol level was .30 percent.[30] Patterson's car jumped the median of a divided road, crossed into the oncoming lanes, and struck two vehicles.[31] Under these facts, the court affirmed Patterson's conviction for extreme indifference murder.[32]

The defendant in *Slaughter,* who had been arrested at least four times previously for driving while intoxicated, spent the day drinking and then he went driving.[33] During the drive, Slaughter either passed out from intoxication or fell asleep; his car crossed the roadway, jumped the curb, and killed a woman who was working in her front yard.[34] On appeal, the Alabama court held that these facts were sufficient to establish extreme indifference murder.[35]

Likewise, in *State v. Schultz,* 141 N.H. 101, 677 A.2d 675, 678 (1996), the New Hampshire Supreme Court held that "extreme indifference [murder] does not require proof of particularly vicious conduct. Rather, the critical factor is the degree to which the defendant disregards the risk of death to another."

We now turn to jurisdictions that retain the common-law definition of murder (*i.e.,* those jurisdictions that define murder as a homicide committed with "malice"). As explained above, the common law recognized

---

**27.** *Allen,* 611 So.2d at 1192.

**28.** Overruled on other grounds in *Fore v. State,* 858 So.2d 982, 990 (Ala.Crim.App.2003).

**29.** 518 So.2d at 816.

**30.** *Id.* at 811–12.

**31.** *Id.* at 810–11.

**32.** *Id.* at 816.

**33.** 424 So.2d at 1367.

**34.** *Id.* at 1366.

**35.** *Id.* at 1367.

extreme recklessness as a category of malice. And courts applying the common-law definition of murder have affirmed murder convictions for homicides committed by intoxicated drivers.

Many of these court decisions involved defendants who engaged in egregiously dangerous driving.[36] However, some of these "reckless murder" cases involved driving that one might typically expect of an intoxicated driver: impatiently attempting to pass a slower vehicle, inability to keep their vehicle traveling in a straight line, failing to see traffic signs and road markings, miscalculating distances, or misjudging the motion of other vehicles.

For instance, in *Geter v. State*, 219 Ga. 125, 132 S.E.2d 30 (1963), the court upheld the murder conviction of a defendant who, driving while intoxicated, attempted to pass the cars ahead of him on an uphill grade, at a place where the roadway was marked with a "no passing" double yellow line. As the defendant crested the hill on the wrong side of the road, he struck an oncoming vehicle and killed three of its occupants.[37] Similarly, in *Shiflet v. State*, 216 Tenn. 365, 392 S.W.2d 676 (1965), the court upheld the murder conviction of an intoxicated driver who veered into the oncoming lane of traffic and struck another vehicle.[38] In *State v. Goodman*, 149 N.C.App. 57, 560 S.E.2d 196 (2002)[39], the court upheld the murder conviction of an intoxicated driver who struck another vehicle when he ran a red light (apparently after passing out, with his "head and arm hanging out of the driver's side window").[40] A major factor in the court's decision was the fact that the defendant had numerous prior convictions for driving while intoxicated and other traffic offenses.[41] And in *Commonwealth v. Taylor*, 461 Pa. 557, 337 A.2d 545 (1975), the court upheld the murder conviction of an intoxicated driver who passed another car at a high rate of speed and struck two boys who were bicycling along the other side of the road.[42] The court stated:

> The intoxicated condition of the driver, the excessive rate of speed [at] which he was traveling, the distance the bodies and bicycles were propelled upon impact, his awareness that this was an area where children were likely to traverse, the absence of any physical or climatic condition which could explain or contribute to the happening of the accident and the appellant's failure to stop immediately after impact, all exhibit the wickedness of disposition, the hardness of heart, cruelty and recklessness associated with murder in the second degree.

*Taylor*, 337 A.2d at 548.

■ Based on these authorities, we hold that in cases of homicide caused by an intoxicated driver, the element of "extreme indifference to the value of human life" required for conviction of second-degree murder under AS 11.41.110(a)(2) can be established not only through evidence that the defendant engaged in egregiously dangerous driving, but also through evidence of the defendant's extreme intoxication, the defendant's decision to ignore warnings not to drive, the defendant's past convictions for driving while intoxicated, the defendant's refusal to participate in court-ordered treatment for alcohol abuse imposed as part of the defendant's sentence or conditions of probation from previous DWI convictions, and the defendant's decision to drive despite a license suspension or revocation stemming from previous DWI convictions.

The presence of some or all of these factors does not necessarily prove that the defendant acted with extreme indifference to the value of human life. However, the jury is entitled to consider these factors when deciding whether the government has proved that the defendant acted with the extreme

36. *See, e.g., United States v. Fleming*, 739 F.2d 945 (4th Cir.1984); *State v. Boone*, 294 Or. 630, 661 P.2d 917, 920–22 (1983).

37. *Geter*, 132 S.E.2d at 31, 35.

38. *Shiflet*, 392 S.W.2d at 678.

39. Reversed on other grounds, *State v. Goodman*, 357 N.C. 43, 577 S.E.2d 619 (2003).

40. *Goodman*, 560 S.E.2d at 198.

41. *Id.* at 199–200.

42. *Taylor*, 337 A.2d at 546.

**194**

degree of recklessness that will support a murder conviction under AS 11.41.110(a)(2).

*Jeffries's argument that the trial judge allowed the State to present irrelevant or unfairly prejudicial evidence*

Jeffries also argues that the trial judge committed error by allowing the State to introduce evidence of Jeffries's prior DWI convictions, evidence of Jeffries's failures to participate in court-ordered alcohol treatment programs, and evidence of the fact that Jeffries's conditions of probation from his prior DWI convictions prohibited him from consuming alcoholic beverages. Jeffries argues that this evidence was either irrelevant or was so unfairly prejudicial that it should have been excluded under Evidence Rule 403.

For the reasons explained in the preceding section of this opinion, we reject Jeffries's arguments. The jury had to decide Jeffries's degree of recklessness. In this context, the evidence of Jeffries's prior convictions was offered, not to prove his characteristic behavior, but rather to establish his level of awareness of the risks created by his driving while intoxicated.[43]

Likewise, Jeffries's repeated refusal to participate in court-ordered alcohol treatment programs, and his refusal to abide by the condition of probation that barred him from drinking, were both relevant to show the degree of Jeffries's disregard for the safety of others. This evidence tended to prove that Jeffries had been put on notice that his drinking behavior was dangerous to others and had to change, and it also tended to prove that Jeffries consciously refused to act on these warnings.

*Conclusion*

The judgement of the superior court is AFFIRMED.

---

**43.** *Accord, Fleming,* 739 F.2d at 949; *Patterson,* 518 So.2d at 814. *See also State v. Goodman,* 357 N.C. 43, 577 S.E.2d 619 (2003) (approving the analysis of the dissenting opinion in the intermediate court of appeals, 560 S.E.2d at 206: although a defendant's prior driving convictions are admissible to prove the malice aforethought required for second-degree murder, the admissibility of those prior convictions is constrained by the requirements that the convictions be (1) recent and (2) based on similar driving misconduct).