THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DANIEL THACKER, Appellant.

First Department, May 23, 1991

## APPEARANCES OF COUNSEL

*Nancy E. Little* of counsel *(Philip L. Weinstein,* attorney), for appellant.

*Susan Gliner* of counsel *(Mark Dwyer* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

## OPINION OF THE COURT

KASSAL, J.

At approximately 1:00 P.M. on July 7, 1986, defendant, a delivery truck driver, was involved in a traffic accident that left one person dead and four others seriously injured. In this appeal, we are called upon to determine whether the conduct which resulted in this tragedy evinced a depraved indifference to human life on the part of defendant, and thus meets the quantum of proof required to sustain his conviction on several counts of the indictment, including murder in the second degree under subdivision (2) of Penal Law § 125.25. We conclude that, however reckless and reprehensible defendant's actions were proved to be, this legal standard was not met and the judgment must, accordingly, be modified.

Defendant began his delivery rounds of July 7, 1986 at approximately 4:00 A.M. In the passenger seat of the 31-foot-long truck he drove was Leon Dozier, a new employee who was being trained by defendant. Dozier testified that defendant was upset and complaining about problems with his girlfriend as they made their deliveries of dry ice that morning. When their rounds were completed at approximate 11:00 A.M., defendant purchased two pint bottles of Wild Irish Rose wine and gave one to Dozier. By the time defendant had driven from Brooklyn to Manhattan, a period of about one hour, he had finished his bottle and half of Dozier's.

Dozier further testified that, after defendant made a brief stop at West 37th Street, during which Dozier waited in the truck, they headed uptown, toward the George Washington Bridge. Throughout this time, defendant's driving and the functioning of the truck appeared normal. When defendant turned on to West End Avenue, Dozier pointed out a sign prohibiting commercial traffic. Based upon the position of the stick shift, which indicated that the truck was in the sixth of ten gears, Dozier estimated that they were traveling at approximately 40 to 50 miles per hour.

After driving 3 or 4 blocks on West End Avenue, defendant went through a red light and, when Dozier commented on this, defendant said he could not get the truck out of gear. As the truck approached a second red light, Dozier told defendant to slow down, but defendant was still unable to get the truck out of gear and said that he could not stop. They then reached a third red light and defendant began to sound his horn and switch lanes to avoid an accident. Throughout this time, the speed of the truck did not decrease and defendant continued to struggle with the wheel and attempt to downshift in an effort to slow the vehicle. As he did so, he hit two parked cars and began to lose control of the truck.

At the next intersection, defendant, still in the same gear, passed through a green light and then sideswiped a car and a van stopped for a red light at the next corner. It appeared that the speed of the truck decreased after hitting the van and Dozier saw, before crouching below the dashboard, that the next light was red and that there were cars stopped for it. In the right, northbound lane of this intersection was a white foreign car, and in the left lane was an Oldsmobile and two other cars. Dozier heard a loud crunch and saw pieces of metal flying just before the truck veered to the left, crossing into the opposite, southbound traffic and coming to a halt after hitting several parked cars.

When the truck had stopped, defendant and Dozier ran to the white car, which was severely damaged. Two people were inside and George Canaras, a pedestrian who later died of his injuries, was pinned underneath.

In addition to Dozier, several eyewitnesses to the accident testified at trial. Among them was Jack Reina, a pedestrian who was about to cross West End Avenue at 85th Street when he heard the truck honk its horn, realized it would not stop for the red light, and jumped back to the curb in time to avoid

being struck. Reina estimated that the truck was traveling at 40 to 45 miles per hour and appeared to be picking up speed. Another witness, Albert Garner, was standing at the southwest corner of 87th Street and West End Avenue, when he saw the truck swerve toward the southbound lanes at 86th Street, to avoid hitting a woman crossing the street with a baby carriage. Garner testified that defendant apparently "tried to correct himself" after swerving, but seemed to lose control of the truck in the process, and struck parked cars.

On the northeast corner of 87th Street, Sandra Beaumont had just observed a "walk" sign when she heard a loud bang and was then hit by the bumper of defendant's passing truck, which, together with debris from parked cars which it had just struck, came flying in her direction. At the northeast corner of 89th Street and West End Avenue, Efrain Claudio, a doorman, also heard the loud noise and saw the truck swerve and then hit a van, which flipped over and plowed into the back of a white car, dragging it and a pedestrian who had been crossing in front of it to the southbound lanes of 90th Street.

In addition to these and other witnesses, the evidence at trial included the testimony of Andrew Mitchell, whose Oldsmobile was struck as he waited for a red light on 89th Street and West End Avenue, Paul Mastrangelo, the driver of the van that was struck from behind, and Demetric Wheeler and Karen Simmons, who were in the white car under which the pedestrian was crushed. Serious injuries were attested to by these witnesses. Wheeler suffered a concussion and fractures to his left arm, shoulder, and leg, as well as to his back. He sustained scars all over his body, including his face and suffered from memory loss and headaches. In addition, Wheeler had undergone two operations in his leg and three on his stomach, had lost the strength in his left arm and on his left side generally, and his left leg remained bent from having been broken in so many places. At the time of trial, Wheeler, who was 21 years old, walked with a limp and was constantly in pain.

Wheeler's passenger and girlfriend, Karen Simmons, had a fractured collarbone and required two stitches under her chin as a result of the collision. The driver of the Oldsmobile, Andrew Mitchell, sustained injuries to his back and was unable to move his neck, which was in a neck brace for approximately five months. Paul Mastrangelo, the driver of the van, testified that he still suffered from lower pelvic pain

and from pain and numbness in his hands, knees, and feet. He could no longer lift objects over 10 pounds and was subject to frequent, severe headaches.

After being arrested, defendant was given a breathalyzer test, which yielded a reading of .14%, and thus established that defendant had consumed a substantial amount of alcohol and, under the New York State law, was legally intoxicated. Defendant was also administered five coordination tests, four of which he was unable to perform. Further testimony from police witnesses indicated that defendant smelled of alcohol, had slightly slurred speech, watery and bloodshot eyes, and generally appeared intoxicated.

Defendant gave a videotaped statement to an Assistant District Attorney, admitting that he had shared one half to three quarters of a bottle of Wild Irish Rose wine with Dozier, and describing his inability to downshift as he drove on West End Avenue, and the eventual loss of control of the truck as he went from lane to lane in an attempt to avoid an accident.

The People's case also consisted of testimony establishing that the truck's braking system was working. One expert who inspected the truck testified, however, that he had difficulty shifting gears.

Taking the stand in his own defense, defendant testified that he began his workday on July 7, 1986 at his usual hour, 3:00 A.M., arriving for work between 3:30 and 4:00 A.M., and had breakfast at approximately 4:20 A.M. Defendant made seven deliveries in Queens and Brooklyn before stopping at approximately 10:30 A.M. to buy a sandwich and soda. He testified that, during this stop, Dozier bought a pint bottle of wine and that they each drank approximately one half of it as they took a 30-minute break. Defendant then began his trip into Manhattan, stopping briefly at 37th Street and Sixth Avenue to visit an uncle, and continuing north toward the George Washington Bridge. Unfamiliar with Manhattan, defendant turned on to West End Avenue at 79th Street, not realizing, until Dozier told him, that commercial traffic was banned.

While looking for a side street wide enough for his truck to turn off West End Avenue, defendant approached 86th Street and tried to downshift in preparation for stopping at the red light. He could not, however, get the shift out of gear, and the clutch pedal, which was going up and down, would not disengage. Defendant then tried to powershift, but the truck did

not respond. When he saw a woman crossing the street with a baby carriage and realized he was about to go through the red light, defendant honked his horn twice and swerved to miss the woman, striking a couple of parked cars. Defendant further testified that he hit his head on the steering wheel when he struck the cars, and was "partially * * * blacked out", but continued to maneuver the truck and attempt to shift gears. By 89th Street, defendant testified, he was "half-blacked out" and still struggling with the gear shift in an effort to stop the truck. He could not recall whether he had put on the brake because he was "half in and half out of it". Defendant also did not remember hitting the Oldsmobile, and had only a vague memory of hitting the van, although he remembered seeing a white car after "refocusing". He further testified that his loss of memory was solely attributable to his injury, and that he had not been affected by the wine.

Following the accident, defendant went to a nearby telephone booth to call his employer and report what happened, saying that the "clutch hung up" and that he "couldn't control the truck". In his testimony, defendant described himself as "practically in a state of shock" after the accident, and not knowing what to do. There was a lot of shouting on the street and Dozier was "going hysterical", as was the brother of Demetric Wheeler. Defendant further testified that because there was a large crowd gathering at the scene, he requested the assistance of a police officer in getting out of the area. The officer took him to the precinct in a patrol car. Defendant was subsequently arrested and, on July 18, 1986, indicted on 16 counts.

On appeal, defendant urges that the circumstances surrounding this tragic incident do not support a finding, beyond a reasonable doubt, that he acted with a depraved indifference to human life, an element present in three of the crimes for which he was convicted. Our review of this record leads us to agree.

Defendant was found guilty, *inter alia,* of murder in the second degree under subdivision (2) of Penal Law § 125.25, assault in the first degree under subdivision (3) of Penal Law § 120.10, and reckless endangerment in the first degree, Penal Law § 120.25, which charges all required proof beyond a reasonable doubt that defendant had acted "under circumstances evincing a depraved indifference to human life". It is this critical element that distinguishes depraved indifference murder from the crime of manslaughter in the second degree

(Penal Law § 125.15 [1]). While each of these statutes encompasses forms of nonintentional homicide, manslaughter in the second degree under Penal law § 125.15 (1) is established by proof beyond a reasonable doubt that the accused "recklessly cause[d] the death of another person". The more serious crime of reckless homicide, Penal Law § 125.25 (2), carries an additional element. It requires proof that, "[u]nder circumstances evincing a depraved indifference to human life," an accused has "recklessly engage[d] in conduct which create[d] a grave risk of death to another person, and thereby cause[d] the death".

As recently summarized by the Court of Appeals, depraved indifference murder requires that "the actor's reckless conduct is imminently dangerous and presents a grave risk of death", while the conduct for manslaughter in the second degree must be shown to "present the lesser 'substantial risk' of death". *(People v Roe,* 74 NY2d 20, 24; *see also, People v Register,* 60 NY2d 270, 276-277.) Designated as the same level of homicide as that of intentional murder, depraved indifference homicide is characterized by "unmitigated wickedness, extreme inhumanity, or actions exhibiting a high degree of wantonness". *(People v Northrup,* 83 AD2d 737, 738.) Or, as stated in the jury charge approved in *People v Fenner* (61 NY2d 971, 973), depraved indifference to human life is characterized by " 'conduct, beyond being reckless * * * so wanton, so deficient in a moral sense of concern, so devoid of regard of the life or lives of others, and so blameworthy as to warrant the same criminal liability as that which the law imposes upon a person who intentionally causes the death of another.' "

In applying this legal standard to the circumstances at bar, we conclude that the People have failed to prove this element beyond a reasonable doubt. The evidence is clear, as adduced from the testimony of the eyewitnesses, as well as that of Dozier and defendant, that defendant frantically made repeated attempts to downshift and to avoid cars and pedestrians as the truck went out of control for several blocks. Thus, for example, both Dozier and eyewitness Reina testified that defendant sounded his horn in warning as he approached red lights, and eyewitness Garner described defendant swerving to avoid a woman with a baby carriage.

Although it was undoubtedly reckless for defendant to have consumed the alcohol and to have neglected to apply his brake —if, indeed, this was the case—during the time that he was struggling with the stick shift and steering wheel, these

actions do not rise to the level of "unmitigated wickedness" or "extreme inhumanity" which characterizes depraved indifference. *(People v Northrup, supra,* at 738.) In this context, we note that the jury declined to find defendant guilty of violating Vehicle and Traffic Law § 1192 (3), which prohibits the operation of a motor vehicle by a person in an "intoxicated condition", and instead found that he had violated Vehicle and Traffic Law § 1192 (2), which is established when blood alcohol content is greater than .10%, but makes no reference to the state of intoxication. We further note that Dozier, who was in the truck during all relevant times, testified that defendant was not unable to perform requisite driving skills. *(See, People v Cruz,* 48 NY2d 419, 428.)

Contrary to respondent's assertion, the facts in this case are distinguishable from those in *People v Gomez* (65 NY2d 9). There, the defendant sped his vehicle down a crowded sidewalk at a high rate of speed and, after striking a boy riding his bicycle, said that he would not apply the brakes because "I have killed a person already", and then accelerated his speed further and mounted another sidewalk, where he struck a second child on a bicycle. In those circumstances, we held, and the Court of Appeals agreed, that the evidence was legally sufficient to support a finding that defendant had acted with depraved indifference to human life.

The proof having fallen short of this standard in the case before us, defendant's conviction for the crimes of murder in the second degree, assault in the first degree, and reckless endangerment in the first degree must be modified to manslaughter in the second degree (Penal Law § 125.15 [1]), assault in the third degree (Penal Law § 120.00 [2]), and reckless endangerment in the second degree (Penal Law § 120.20), respectively.

■ We further hold, and the People concede, that defendant's adjudication as a predicate felon was improper, since his Iowa conviction for a crime of theft in the second degree was not the equivalent of a New York felony at the time of the predicate felony hearing. *(See,* Penal Law § 70.06 [1]; *People v Gonzalez,* 61 NY2d 586, 589; *People v Sailor,* 65 NY2d 224, 237, *cert denied* 474 US 982.) Defendant's remaining argument on appeal raises various claims of prosecutorial misconduct, none of which has been preserved for appellate review as a matter of law (CPL 470.05 [2]; *People v Balls,* 69 NY2d 641), and we decline to reach them in the interest of justice.

Accordingly, the judgment, Supreme Court, New York County (Dorothy Cropper, J.), rendered April 6, 1988, convicting defendant, after a jury trial, of murder in the second degree (Penal Law § 125.25 [2]), assault in the first degree (Penal Law § 120.10 [3]), reckless endangerment in the first degree (Penal Law § 120.25), assault in the third degree (three counts) (Penal Law § 120.00 [2]), and driving under the influence (Vehicle and Traffic Law § 1192 [2]), and sentencing defendant, as a second felony offender, to concurrent indeterminate terms of imprisonment of from 15 years to life, 7½ to 15 years, 3½ to 7 years, one year, and one year, respectively, should be modified, on the law, to reduce the conviction for murder in the second degree to manslaughter in the second degree (Penal Law § 125.15 [1]), the conviction for assault in the first degree to assault in the third degree (Penal Law § 120.00 [2]), and the conviction for reckless endangerment in the first degree to reckless endangerment in the second degree (Penal Law § 120.20), and to vacate all felony sentences and remand for sentencing as a first felony offender, and otherwise affirmed.

SULLIVAN, J. P., ROSENBERGER, KUPFERMAN and ASCH, JJ., concur.

Judgment, Supreme Court, New York County, rendered April 6, 1988, modified, on the law, to reduce the conviction for murder in the second degree to manslaughter in the second degree (Penal Law § 125.15 [1]), the conviction for assault in the first degree to assault in the third degree (Penal Law § 120.00 [2]), and the conviction for reckless endangerment in the first degree to reckless endangerment in the second degree (Penal Law § 120.20), and to vacate all felony sentences and remand for sentencing as a first felony offender, and otherwise affirmed.